IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EVERLAST ROOFING, INC.,** | : | Civil No. 1:23-CV-828 |
| | : | |
| Plaintiff, | : | (Judge Mehalchick) |
| | : | |
| v. | : | |
| | : | |
| **MATTHEW WILSON, et al.,** | : | (Magistrate Judge Carlson) |
| | : | |
| Defendants. | : | |

**MEMORANDUM AND ORDER**

**I.     Background**

Today we write the next chapter in this litigation, a case which threatens to become an epic of dysfunctional discovery. On May 19, 2023, the plaintiff filed a multi-count lawsuit against the defendants alleging breach of contract, tortious interference with contract, unfair competition, and misappropriation of trade secrets. (Docs. 1 and 72). The plaintiff seeks more than $24,000,000 in damages on these claims, making this high-stakes litigation for all parties. (Doc. 89-1).

The parties have long been embroiled in contentious discovery disputes. On January 6, 2025, the district court referred these discovery questions to the undersigned. (Doc. 156). We now turn to the two latest aspects of this disputatious discovery process: (1) additional, ongoing disagreements regarding how to best search for electronically stored information (ESI); and (2) complaints by the

defendants regarding the adequacy of Everlast's responses to interrogatories requesting that the plaintiff identify the trade secrets which were allegedly purloined by the defendants with particularity.

We have repeatedly endeavored to instill in the parties a mutual commitment to cooperatively working together to resolve discovery issues in a collaborative fashion. However, to date, our entreaties seem to have largely fallen on deaf ears. Indeed, it is emblematic of the parties' inability to cooperate and communicate that their latest submissions concerning the ESI issues in this case contain two utterly irreconcilable competing narratives regarding the course of an in-person meet and confer. It is frankly astonishing that these litigants are unable to come away from an in person meeting with a common understanding of what they have said or agreed to do. Counsel can, should, and must do better. However, in light of their current communication shortcomings, it will fall to us to resolve these discovery issues.

## II.   Discussion

### A. Guiding Legal Standards

The parties' latest discovery disputes are judged against familiar legal guideposts. As we have observed when addressing similar discovery issues:

> Rulings regarding the proper scope of discovery are matters consigned to the court's discretion and judgment. A court's decisions regarding the conduct of discovery will be disturbed only upon a showing of abuse of that discretion. Marroquin-Manriquez v. I.N.S., 699 F.2d 129, 134 (3d Cir. 1983). This far-reaching discretion also extends to rulings by United States Magistrate Judges on discovery matters. In this regard:

> District courts provide magistrate judges with particularly broad discretion in resolving discovery disputes. See Farmers & Merchs. Nat'l Bank v. San Clemente Fin. Group Sec., Inc., 174 F.R.D. 572, 585 (D.N.J. 1997). When a magistrate judge's decision involves a discretionary [discovery] matter ..., "courts in this district have determined that the clearly erroneous standard implicitly becomes an abuse of discretion standard." Saldi v. Paul Revere Life Ins. Co., 224 F.R.D. 169, 174 (E.D. Pa. 2004) (citing Scott Paper Co. v. United States, 943 F. Supp. 501, 502 (E.D. Pa. 1996)). Under the standard, a magistrate judge's discovery ruling "is entitled to great deference and is reversible only for abuse of discretion." Kresefky v. Panasonic Commc'ns and Sys. Co., 169 F.R.D. 54, 64 (D.N.J. 1996); see also Hasbrouck v. BankAmerica Hous. Servs., 190 F.R.D. 42, 44-45 (N.D.N.Y. 1999) (holding that discovery rulings are reviewed under abuse of discretion standard rather than de novo standard); EEOC v. Mr. Gold, Inc., 223 F.R.D. 100, 102 (E.D.N.Y. 2004) (holding that a magistrate judge's resolution of discovery disputes deserves substantial deference and should be reversed only if there is an abuse of discretion).

Halsey v. Pfeiffer, No. 09-1138, 2010 WL 2735702, at *1 (D.N.J. Sept. 27, 2010).

The exercise of this discretion is guided, however, by certain basic principles. At the outset, Rule 26(b) of the Federal Rules of Civil Procedure generally defines the scope of discovery permitted in a civil action, prescribes certain limits to that discovery and provides as follows:

> (b) Discovery Scope and Limits.
>
> (1) *Scope in General.* Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional

3

> to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b).

Thus, our discretion is limited in a number of significant ways by the scope of Rule 26 itself, which provides for discovery of only "nonprivileged matter that is relevant to any party's claim or defense." Therefore, "[t]he Court's discretion in ruling on discovery issues is, therefore, restricted to valid claims of relevance and privilege." Robinson v. Folino, No. 14-227, 2016 WL 4678340, at *2 (citing Jackson v. Beard, No. 11-1431, 2014 WL 3868228, at *5 (M.D. Pa. Aug. 6, 2014) ("[a]lthough the scope of relevance in discovery is far broader than that allowed for evidentiary purposes, it is not without its limits.... Courts will not permit discovery where a request is made in bad faith, unduly burdensome, irrelevant to the general subject matter of the action, or relates to confidential or privileged information")).

Accordingly, at the outset it is clear that Rule 26's definition of that which can be obtained through discovery reaches any nonprivileged matter that is relevant to any party's claim or defense, and valid claims of relevance and privilege still cabin and restrict the court's discretion in ruling on discovery issues. Furthermore, the scope of discovery permitted by Rule 26 embraces all relevant information, a concept which is not confined to admissible evidence but is also defined in the following terms: "Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Rather, Rule 26 states that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." This concept of relevance is tempered, however, by principles of proportionality. Thus we are now enjoined to also consider whether the specific discovery sought is "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant

4

information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "Thus, it has been said that the amended rule 'restores the proportionality factors to their original place in defining the scope of discovery.' " Fassett v. Sears Holdings Corp., 319 F.R.D. 143, 150 (M.D. Pa. 2017) (quoting Wertz v. GEA Heat Exchangers Inc., No. 1:14-CV-1991, 2015 WL 8959408, at *2 (M.D. Pa. Dec. 16, 2015)).

Lawson v. Love's Travel Stops & Country Stores, Inc., No. 1:17-CV-1266, 2020 WL 109654, at *2–3 (M.D. Pa. Jan. 9, 2020).

Exercising this broad discretion and presented with the inability of counsel to amicably resolve their own disputes we address their presenting discovery controversies below.

**B. ESI Discovery**

At the outset, the parties once again revisit what are for them intractable ESI discovery issues. The gravamen of this instant dispute remains ESI search protocols relating to two discovery requests: Request 1, which seek emails and other ESI from May 15, 2019 to present relating to Everlast's sales and profits during the time in which it is alleged that the defendants unlawfully diverted their business; and Request 2, which calls for a search of ESI from a five month period relating to allegations that Everlast recorded communications involving defendant Wilson.

When this dispute was presented to us in May of 2025 with respect to Request 1 the parties' inability to agree upon search terms and a rational sampling process led the Wilson defendants to identify a universe of some 94,000 potentially

responsive records while Everlast indicated that its search terms yield a mere 1,800 responsive records. (Doc. 179). Likewise, with respect to Request 2 the parties' disagreements regarding proper search terms yielded vastly different results, with the Wilson defendants claiming that their search terms resulted in some 10,500 hits while Everlast's search terms produced only 279 responsive documents. Accordingly, when the parties' respective positions on these two sets of requests were combined there was a gulf of more than 100,000 records between the defendants' contention that there are a combined 104,500 responsive documents and Everlast's view than only 2,000 relevant records existed.

    Confronted with this dispute on May 21, 2025, we entered an order which noted that there were ample reasons to be skeptical of either of the extreme positions posited by the parties and told counsel that "the parties' own submissions reveal that they have more work to do if they wish to comply with the Sedona principles which guide ESI discovery." Accordingly, we ordered that: "on or before **June 23, 2025**, the counsel and their ESI vendors shall meet *in person* to develop and fully implement a collaborative data-driven sample testing strategy to determine which of the remaining approximately 100,000 records identified by the defendants' search terms may also be relevant and proportionate to the needs of this case." (Doc. 188).

    The parties' latest submissions reveal that they have to an astonishing degree failed in this task. (Docs. 204, 205). Indeed, the extraordinary degree of their mutual

6

dysfunction is exemplified by the fact that in their warring submissions counsel cannot even *agree upon* what they are alleged to have *agreed to* in their meet and confer session. Frankly this inability to perform even rudimentary tasks should be a source of chagrin for all involved.

In reviewing the parties' competing submissions it is clear that they are unable to agree on the following basic aspects of an ESI protocol: (1) cost sharing for the expense of discovery; (2) procedures for culling and refining samples from the 100,000 disputed documents; (3) whether the documents should be produced in a native format with metadata; (4) which counsel will review the documents for relevance; (5) how many counsel will be involved in this discovery process; (6) how to dispose of documents that all parties agree are irrelevant; and (7) whether counsel should be required to exchange affidavits relating to this process. Therefore, in the absence of any reasoned approach by counsel to these questions, we will address these issues for the parties.

**Cost sharing**: ESI discovery can be a costly proposition, and it may be that cost considerations are driving some of these disputes. For Everlast the cost of ESI discovery may lead it to take a narrow view of what is discoverable based upon concerns that it will bear the entire cost of this process. In contrast, the defendants may embrace a more sweeping view of how ESI discovery should be conducted because they are unconcerned about the costs that may be borne exclusively by

Everlast. It is well settled, particularly in the context of cost intensive and contested ESI discovery, that the court may in the exercise of its discretion order cost sharing by the parties, particularly when dealing with sophisticated parties who have the apparent resources to engage in detailed discovery. See <u>Boeynaems v. LA Fitness Int'l, LLC</u>, 285 F.R.D. 331, 337 (E.D. Pa. 2012). In this setting: "The added benefit of requiring the parties to share costs is that it encourages the parties to come up with a discovery plan that is time and cost efficient," something which has thus far eluded counsel. <u>Costantino v. City of Atl. City</u>, 152 F. Supp. 3d 311, 336 (D.N.J. 2015). In addition, cost sharing enables the party requesting discovery to engage in a more fully informed discovery cost-benefit analysis. Therefore, we will order the parties to share the costs of future ESI discovery as part of any ESI protocol.

**ESI Sampling Procedures**: As for ESI sampling procedures, the parties present us with two contrasting views. As we understand it,[1] The defendants urge us to simply direct that a random sample of one tenth or one twentieth of the 100,000 records be produced by Everlast for inspection by the defendants. In turn, we believe that Everlast proposes a somewhat more targeted and analytical approach in that it recommends that the parties agree upon the culling of a smaller statistically valid random sample of these records and then use predictive analytics to identify from

---

[1] To the extent that we have misconstrued the parties' proposals, the parties are directed to provide a single document containing a comprehensive description of their respective search sampling procedures.

these documents the records which appear to have the highest degree of relevance to the issues in this case. Based upon this review, the parties could then tailor a more targeted searches aimed at identifying relevant data with a 95% accuracy rate.

On this score, counsel's inability to agree upon sampling procedures truly places them "where angels fear to tread," Lawson v. Love's Travel Stops & Country Stores, Inc., No. 1:17-CV-1266, 2019 WL 7102450, at *2 (M.D. Pa. Dec. 23, 2019), since their defaults compel us to decide this aspect of a search protocol. With this responsibility thrust upon us by the litigants' intransigence, we conclude that a technology-assisted review, or "TAR," process which uses computer software that learns to distinguish between responsive and non-responsive documents based on coding decisions made by knowledgeable reviewers on a subset of the document collection, to establish search parameters for the entire collection is the most efficient and effective way in which to proceed. In re Diisocyanates Antitrust Litig., No. MC 18-1001, 2021 WL 4295729, at *1 (W.D. Pa. Aug. 23, 2021), report and recommendation adopted, No. MC 18-1001, 2021 WL 4295719 (W.D. Pa. Sept. 21, 2021). Therefore, the parties' ESI protocol should draw upon a statistically valid random sample and then include a TAR procedure aimed at using this smaller sample to define search parameters which achieve a 95% accuracy rate when reviewing these records.

**Metadata**: We understand that the defendants are seeking the production of ESI in its native format with accompanying metadata. Since we are ordering the parties to evenly share the costs of ESI discovery, thus mitigating the costs and burdens associated with production in this format, we agree with those courts that have ordered this form of ESI production. See Romero v. Allstate Ins. Co., 271 F.R.D. 96, 106 (E.D. Pa. 2010).

**Who May Participate in This Review Process**: The parties also dispute which counsel, and how many attorneys, may review the various samples culled as part of this ESI discovery process. On this score, we conclude that the parties must implement procedures which provide for mutual inspection of any samples drawn from these disputed records to determine sample relevance and refine search parameters. See Lawson v. Love's Travel Stops & Country Stores, Inc., No. 1:17-CV-1266, 2019 WL 7102450, at *7 (M.D. Pa. Dec. 23, 2019). We will not impose any limitations on the number of counsel that each party may assign to this task.

**Disposition of Irrelevant Documents**: These ESI discovery procedures will inevitably entail some disclosures of documents that are not relevant, particularly as parties refine their search parameters. Therefore, the parties' ESI protocol must provide for the prompt return or destruction of irrelevant information.

**Counsel Affidavits**: The enmity and distrust between these parties is illustrated by the suggestion that some counsel should be required to submit

affidavits attesting under oath to certain aspects of this ESI discovery process. Attorneys are officers of the court, who have a legal and ethical duty of candor to the court and opposing counsel. In light of these longstanding legal ethical obligations, we do not regard the exchange of affidavits as necessary; however, if one party insists on affidavit from opposing counsel, then all parties will be required upon request to swear out affidavits.

Finally, we note that while the inability of the parties to resolve these issues has compelled us to frame their ESI search procedure for them, nothing in this order prevents the parties from now doing what we have ordered them to do: adopt a mutually agreeable ESI search process. Our order follows:

### ESI Order

AND NOW this 16th day of July 2025, IT IS ORDERED that on or before **September 1, 2025**, the parties will implement an ESI protocol which complies with the standards set forth above, or stipulate the some other, mutually acceptable, comprehensive ESI protocol.

### C. Sufficiency of Trade Secret Disclosures

The second burgeoning discovery issue dividing the parties relates to the sufficiency of Everlast's responses to interrogatories seeking information relating to its trade secret claims. (Docs. 189, 194, 199). While acknowledging that they have over time received "voluminous" responses to these discovery demands from

11

Everlast, (Doc. 189 at 5),[2] the defendants insist that the plaintiff's identification of the trade secrets that it claims were misappropriated remains deficient because Everlast has not provided: (1) identity and specific description of each of the trade secrets; (2) a specific explanation of how each of those purported trade secrets derives value from being kept confidential; and (3) a specific explanation of how the Wilson Defendants allegedly used and/or misappropriated each of those purported trade secrets. (Id. at 28). In particular, the defendants insist that these responses are inadequate to the extent that they are ambiguously illustrative; that is, instead of listing all items that it contends are trade secrets Everlast is alleged to simply provide an example of a trade secret for illustrative purposes leaving the possibility that it considers other, undisclosed items as trade secrets. In addition, the defendants assert that, to the extent Everlast is identifying trade secrets by reference to documents it has produced in discovery, those references are unduly vague and need to be supplemented with greater precision. For its part, Everlast insists that its trade secret descriptions are sufficiently clear to put the defendants on full notice of its claims and that no further supplementation is needed.

---

[2] We note that it does appear that Everlast has made substantial disclosures identifying the following categories of alleged trade secrets: Customer preference information; customer services strategies; pricing information; other customer information; and customer lists.

It is, of course, manifestly in Everlast's legal interest to identify the trade secrets it alleges were purloined with specificity since the failure to do so may result in this dismissal of those claims on summary judgment or at trial. Everlast's obligation to clearly identify its trade secrets stems from the fact that:

> The "starting point" in misappropriation cases is "whether, in fact, there is a trade secret to be appropriated." Van Prods. Co. v. Gen. Welding & Fabricating Co., 419 Pa. 248, 213 A.2d 769, 780 (Pa.1965); see also Continental Data Sys., Inc. v. Exxon Corp., 638 F.Supp. 432, 442 (E.D.Pa.1986) ("even wrongful appropriation is not actionable unless the information in question is a trade secret"). To prevail on its trade secrets claims,[a plaintiff] first must
>
>> show the existence of a trade secret with "reasonable degree of precision and specificity ... such that a reasonable jury could find that plaintiff established each statutory element of a trade secret." This identification must be particular enough as to separate the trade secret from matters of general knowledge in the trade of or special knowledge of persons skilled in the trade.
>
> Dow Chem. Canada Inc. v. HRD Corp., 909 F.Supp.2d 340, 346 (D.Del.2012): see also Sit–Up Ltd. v. IAC/InterActiveCorp., No. 05–9292, 2008 WL 463884, at *11 (S.D.N.Y. Feb.20, 2008) ("[S]pecificity is required before the court so that the defendant can defend himself adequately against claims of trade secret misappropriation, and can divine the line between secret and non-secret information, and so that a jury can render a verdict based on a discriminating analysis of the evidence of disclosure and misappropriation.").

Syngy, Inc. v. ZS Assocs., Inc., No. CIV.A. 07-3536, 2015 WL 899408, at *6 (E.D. Pa. Mar. 3, 2015). In this regard, it has been held that: "proper disclosure required a statement of the 'claimed trade secrets with particularity, specifically identifying which elements are in the public domain and which are its trade secrets,

13

including any combinations of elements claimed as a trade secret. . . ." <u>Arconic Inc. v. Novelis Inc.</u>, No. CV 17-1434, 2018 WL 6738066, at *2 (W.D. Pa. Oct. 18, 2018).

Recognizing the importance of disclosure of trade secrets in discovery, including identifying which elements are in the public domain and which are its trade secrets, we will direct Everlast to review its prior interrogatories and, as needed, supplement those interrogatories to, within a reasonable degree of precision and specificity: (1) identity and describe each of the trade secrets; (2) explain how each of those purported trade secrets derives value from being kept confidential; and (3) explain how the Wilson Defendants allegedly used and/or misappropriated each of those purported trade secrets.

These supplemental responses should also: (1) identify which elements of these trade secrets are in the public domain and which are its trade secrets; (2) with respect to responses which refer to documents produced in discovery specifically identify all of those documents which describe trade secrets; and (3) list all items that it contends are trade secrets instead of providing an example of a trade secret for illustrative purposes leaving the possibility that it considers other, undisclosed items as trade secrets.

An appropriate order follows.

## **Trade Secret Discovery Order**

AND NOW this 16th day of July 2025, IT IS ORDERED that on or before **September 1, 2025**, the plaintiff will supplement its trade secret interrogatory responses in the fashion described above.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge
